## NORTON et al. v. CITY BANK & TRUST CO.

(Circuit Court of Appeals, Fourth Circuit. November 21, 1923.)

### No. 2116.

1. **Courts ☞353—State statute allowing court to decide on merits, when verdict set aside, not followed in federal courts.**

   Code Va. 1919, § 6251, allowing court to decide case on its merits when verdict is set aside, without granting new trial, does not permit the exercise of such power by a judge in the federal court, in view of Const. U. S. Amend. 7, which requires new trial on vacation of verdict.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **New trial ⬅97—May be granted even where error, or point relied on for different result, was not timely called to trial judge's attention.**

    A trial judge may, in the exercise of a sound discretion, at the instance of a party, or on his own motion, set aside a verdict or grant a new trial, when convinced that, because of some accident, mistake, or misfortune in the conduct of the trial, a new trial is necessary to prevent a failure of justice, and may do so, although the circumstances are such as to deny to the losing party any right of appellate review, as where the error or point relied on was not called to the trial court's attention.

3. **Banks and banking ⬅148(2)—Bills and notes ⬅6—Check held drawn to fictitious payee, although payee named was in existence; bank not liable for payment of check to "fictitious person" on unauthorized indorsement.**

    Where agent for plaintiff, with power to draw checks on its local bank account, was agent also for another concern, and drew a check to such other concern, which had no right to it, with the intention, not that the other concern should receive the proceeds of the check, but that the check should be used in kiting operations to conceal the agent's embezzlement from plaintiff, which was done, *held*, that the check was payable to a "fictitious person," and hence, under Code Va. 1919, § 5571, subsec. 3, payable to bearer, so that the drawee bank was not liable for cashing it on the agent's unauthorized indorsement of it for the other concern; it being immaterial that the payee was in fact in actual existence.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fictitious Name.]

4. **Bills and notes ⬅6—Payee is "fictitious person," although existing, if having no right to proceeds of instrument, and not intended to take by it; "fictitiousness."**

    A negotiable instrument is drawn to a fictitious payee, whenever the payee named therein, although in existence, has no right to it, and the maker does not intend that such payee shall take anything by it; "fictitiousness" depending on the intention to pay, rather than on the payee's existence.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Action by Skeffington S. Norton and others, copartners trading as Norton, Lilly & Co., against the City Bank & Trust Company. Judgment for defendant, and plaintiffs bring error. Reversed and remanded.

Edward R. Baird, Jr., of Norfolk, Va., and Ernest E. Baldwin, of New York City (Baldwin, Barns & Weeks, of New York City, Baird, White & Lanning, of Norfolk, Va., Richard F. Weeks, of New York City, and R. Clarence Dozier, of Norfolk, Va., on the brief), for plaintiffs in error.

Tazewell Taylor and W. W. Starke, both of Norfolk, Va. (W. R. Ashburn, of Norfolk, Va., on the brief), for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The plaintiffs in error were plaintiffs below and will be so designated here. The individuals, who as partners traded as Norton, Lilly & Co., were citizens of states other than Virginia, of which the defendant is a corporation. They were steamship agents and brokers, having their principal office at New York but maintaining a branch office at Norfolk and at other ports. In 1921 their Norfolk office was in charge of one Odend'hal who was, at the same

time, the representative in that city of several other concerns, among them one known as the Cory-Mann-George Corporation, which, for brevity, will hereafter be called the Cory. The various firms and corporations for whom Odend'hal acted shared a common office and severally contributed to his compensation and its maintenance. The record does not disclose that there were any other relations among them.

The plaintiffs kept an account at the defendant bank. The Cory had one with a then existing institution, known as the Commercial Exchange Bank. Odend'hal was authorized to draw checks on its account and also on that of the Cory, although in the latter case the checks had to be countersigned by a Mrs. Haverstock, who was cashier and book-keeper for the Cory, as well as for the plaintiffs. As between himself and his principals, his authority in this respect was limited to making disbursements for their respective accounts. He had no right to use any of the moneys of either of them for any individual purpose of his own. His power to indorse checks payable to either was limited to an indorsement for deposit to its account.

On May 4, 1923, Odend'hal, in plaintiffs' name drew upon the defendant a check for $15,000 and made it payable to the Cory. The plaintiffs owed the Cory nothing, had no reason for paying it anything, and then, and for more than six months thereafter, were altogether unaware that any payment had been made. The Cory was in like ignorance. Odend'hal indorsed the check with the corporate name of the Cory and deposited it to his individual account at the Commercial Exchange Bank already mentioned. He caused Mrs. Haverstock, his bookkeeper, to enter in the cash book of the plaintiffs' the check as a loan to the Cory. At the end of every month, the plaintiffs required Odend'hal to procure from the bank and to forward to it a signed statement showing what balance they then had with it. On the 31st of May, Odend'hal drew a check of the Cory's for $15,000 on the Commercial Exchange Bank and deposited it with the defendant to the plaintiffs' credit. The Cory required him to send a similar statement, but, as he was vice president of the Commercial Exchange Bank, he was able to induce the cashier to believe that the statements that he made up were accurate and to certify to them, without comparison with the bank's books.

For six months, or thereabouts, by kiting checks between the two accounts, Odend'hal concealed from both the plaintiffs and the Cory the fact that he was short in his accounts with each of them. These checks finally became so numerous as to attract the attention of defendant's vice president. He made up his mind to go to New York to tell the plaintiffs what he had noticed. On December 6, 1921, he had an interview with them, in consequence of which they and the Cory united in sending a certified accountant to Norfolk to check up the accounts of each concern. As a result of his investigations, the plaintiffs some time during the month of December, 1921, became aware of what had happened. They, the Cory and two other concerns for whom Odend'hal had acted, filed a bill in equity against the Commercial Exchange Bank, the purpose of which was, among other things, to charge that bank with the $15,000 of plaintiffs' funds which Odend'hal had converted to his own use in the manner already stated.

[1] Insolvency of the Commercial Exchange Bank about this time became manifest, and on the 21st of July, 1922, without any previous demand of the plaintiffs upon the defendant, this suit was brought to recover the $15,000 from it. At the trial below, defendant contended that the particular $15,000 drawn on the check in question had been repaid to the plaintiffs, and that, even if it had not been, plaintiffs could not recover because of laches, and also because they had sued the Commercial Exchange Bank. The learned District Judge told the jury that there had been no repayment, and the action was not barred by the suit against the other bank. The question of laches he left to them, and their verdict was for the plaintiffs, who moved for a judgment upon it. The defendant, seeking to avail itself of section 6251 of the Code of Virginia, countered with a motion to set aside the verdict and to enter a judgment for it. The portion of the statute relied on reads:

"When the verdict of a jury in a civil action is set aside by a trial court on the ground that it is contrary to the evidence or without evidence to support it, a new trial shall not be granted if there is sufficient evidence before the court to enable it to decide the case upon its merits, but such final judgment shall be entered as to the court shall seem right and proper."

To support the motion, the defendant contended that by the provision of the Uniform Negotiable Instruments Act, codified in Virginia as subsection 3 of section 5571 of its Code, the check in controversy was in legal effect payable to bearer, and that therefore the defendant was justified in paying it, in spite of the fact that it bore an unauthorized or forged indorsement. The pertinent portion of the subsection is that which declares:

An "instrument is payable to bearer * * * when it is payable to the order of a fictitious or nonexisting person and such fact was known to the person making it so payable."

The learned judge, being of the opinion that the defendant was right as the evidence stood, asked if, in the event of a new trial, either of the parties would offer any testimony. They said "No," and he thereupon set aside the verdict of the jury and gave judgment for the defendant. A note of the revisors of the Code of Virginia informs us that the advantage of section 6251, which is relied on as justifying the order of the court, is—

"to end the action at once and put the losing party to his writ of error, thus avoiding the temptation to perjury and in many cases the unnecessary expense of a second trial."

It is explained that a further effect of the section is that:

"It will probably be used as a substitute for a demurrer to the evidence. Instead of demurring to the evidence, the trial will proceed to verdict, and the losing party will move to set aside the verdict because contrary to the evidence or without evidence to support it; and if the court sustains the motion, it will enter judgment accordingly, and the party in whose favor the verdict was rendered will then apply for a writ of error The verdict is not robbed of any of the weight heretofore given to the verdict of the jury but the judgment of the appellate court, instead of remanding a case for a new trial, would be a final judgment, just as it was under the former law on a demurrer to the evidence. The advantage of getting rid of the additional trial seems to be manifest."

All this may be true, but nevertheless the Constitution of the United States, as it has been authoritatively interpreted by the Supreme Court of the United States, denies any such power to a judge in a federal court.

"The terms of the Seventh Amendment and the circumstances of its adoption show that one of its purposes was to require adherence to the rule of the common law that a verdict cannot be disturbed for an error of law occurring on the trial without awarding a new trial. The right to a new trial on the vacation of a favorable verdict in a case of this nature is a matter of substance, and not of form." Slocum v. New York Life Insurance Co., 228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029.

[2] It follows that the plaintiffs are right to the extent that so much of the order below as directs the entry of a judgment for the defendant must be reversed, but they insist that we should go farther ·and require that a judgment in their favor be entered upon the verdict already returned. They say that the setting up of the provisions of the subsection of the Negotiable Instruments Act is a pure afterthought; no hint of reliance upon it was given at the trial, although the defendants and their learned counsel are conclusively presumed to have known of it. They cite innumerable authorities to the effect that "a new trial should not be granted merely because the losing party, or its attorney, did not exercise prudence, and can probably make a better case or defense on another trial," and that "a new trial will not be granted ordinarily to enable a plaintiff to recover on some ground not claimed at the trial, even though it be apparently disclosed by the evidence, or to enable a defendant to avail himself of a new defense which was within the issues, but not presented at the trial, or to make a defense inconsistent with the one presented or contradictory to admissions made or points tacitly conceded." 29 Cyc. 852.

While one or more of the grounds of defense which, in accordance with the Virginia practice, were set up by defendant, were broad enough. to sustain the contention upon which it now relies, as for example, the second, which said "that the check was so drawn as to authorize the defendant to pay it," yet it is true, as the learned counsel for the defendant candidly stated in the argument at this bar, that they had not at the time had the provisions of the Negotiable Instruments Act in mind, and of course did not call them to the attention of the court below. Nevertheless we are not prepared to hold that the trial judge may not, in the exercise of a sound discretion, at the instance of a party or on his own motion, set aside a verdict or grant a new trial, when he is convinced that, because of some accident, mistake, or misfortune in the conduct of the trial, a new trial is necessary to prevent a failure of justice. Ellis v. Ginsburg, 163 Mass. 143, 39 N. E. 800. He may do so, although the circumstances are such as to deny to the losing party any right of review by an appellate tribunal. The Supreme Court has clearly made this distinction when it said:

"A trial court may, in the exercise of its judicial discretion, grant a new trial, if convinced its charge was wrong, even though its attention was not called to the error complained of before the case was finally submitted to the jury But not so with us our power is confined to exceptions actually taken at the trial." Railway Co. v. Heck, 102 U. S. 120, 26 L. Ed. 58.

[3, 4] The plaintiffs say that, even if so much be conceded, nevertheless the order for a new trial must be reversed, because it was made upon an assumption of law which is in itself erroneous, namely, "that the evidence in the case showed the check in question to be payable to a fictitious person." Obviously, it would be unnecessary to inquire whether any such right to review an order granting a new trial exists, if in point of fact the learned judge below was right in his conclusion that the check was one which in legal intent was payable to bearer. In one sense, of course, the Cory was not fictitious. It not only was a real thing, but was a concern with which all the other parties to the transaction were more or less well acquainted. That it had an actual existence, and was well known to every one concerned, quite probably explains why it was that the point now relied on by the defendant did not earlier suggest itself, either to its learned counsel or to the court below. Nevertheless, the law is now well settled that a negotiable instrument is drawn to a fictitious payee whenever the payee named in it has no right to it, and its maker does not intend that such payee shall take anything by it. Snyder v. Corn Exchange National Bank, 221 Pa. 599, 70 Atl. 876, 128 Am. St. Rep. 780; Mueller & Martin v. Liberty Insurance Bank, 187 Ky. 44, 218 S. W. 465; Phillips v. Mercantile National Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596; American Hominy Co. v. Milliken National Bank (D. C.) 273 Fed. 550; U. S. v. Chase National Bank (C. C. A. 2d Circuit) 250 Fed. 105, 162 C. C. A. 277; Bartlett v. First National Bank of Chicago, 247 Ill. 490, 93 N. E. 337; 1 Daniel on Negotiable Instruments, § 141, p. 188; Crawford, Annotated Negotiable Instruments Law, § 33. As it is well said in Phillips v. Mercantile National Bank, supra:

"Fictitiousness of the maker's direction to pay does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name."

There can be no question that upon the evidence in this case, as it appears in this record, the Cory had no right to the check or to the money represented by it, and that Odend'hal never intended that it should ever receive one penny of it. It is immaterial that he caused it to be charged on the books of the plaintiffs as a loan to the Cory. His so doing was obviously nothing more than a device to prevent Mrs. Haverstock suspecting that anything was wrong. The money never went to the Cory. Odend'hal, on the very day the check was drawn, appropriated it to his own use.

The plaintiffs cite such cases as Harmon v. Old Detroit National Bank, 153 Mich 73, 116 N. W. 617, 17 L. R. A. (N. S.) 514; Los Angeles Investment Co. v. Homes Savings Bank, 180 Cal. 601, 182 Pac. 293, 5 A. L. R. 1193; Jordan Marsh Co. v. National Shawmut Bank, 201 Mass. 397, 87 N. E. 740, 22 L. R. A. (N. S.) 250; Armstrong v. Pomeroy National Bank, 46 Ohio St. 512, 22 N. E. 866, 6 L. R. A. 625, 15 Am. St. Rep. 655; Boles v. Harding, 201 Mass. 103, 87 N. E. 481; Seaboard National Bank v. Bank of America, 193 N. Y. 26, 85 N. E. 829, 22 L. R. A. (N. S.) 499; Chism, Churchill & Co. v. First National Bank, 96 Tenn. 641, 36 S. W. 387, 32 L. R. A. 778,

54 Am. St. Rep. 863. These are all beside the mark. In each of them the maker at the time he executed the instrument believed it was for the use of a genuine person whose name was set forth in it, although this belief was in point of fact unfounded, and was the result of fraudulent representations made to the maker. All of the instruments with which they were concerned were excepted from the operation of our Negotiable Instruments Act by the concluding clause in its subsection now in question, which clause distinguishes it from the otherwise similar provision in the English Bill of Exchange Act construed and applied in Bank of England v. Vagliano Brothers, L. R. 1891, 1 Appeal Cases, 107.

The plaintiffs rely on U. S. v. National Bank of Commerce, 205 Fed. 433, 123 C. C. A. 501, and again in 224 Fed. 679, 140 C. C. A. 219. In that case the Circuit Court of Appeals for the Ninth Circuit did not question that the law had been properly laid down in such cases as Phillips v. Mercantile National Bank, supra, but based its decision upon the distinction which that court, correctly or otherwise, assumed to exist between the government and a private party. It is, of course, possible that at the new trial, which must be had, the evidence may put a different aspect upon the case; but, as the record before us stands, the check in controversy was payable to a fictitious person within the meaning of the Negotiable Instruments Act, and therefore was in legal effect payable to bearer, and the defendant was not at fault in paying it.

The accepted rule is neither arbitrary nor fanciful, but is both just and equitable. The owner of the funds trusts its agent. It tells the bank to pay out its funds on his order. As between him and the bank, the latter is bound to pay whomsoever he will. If any particular check is paid to a person whom he intended to receive it, the bank has done precisely what it was instructed to do. In such cases as that here involved, it is true that the agent has proved false to his trust, and some innocent person must be the loser. Should it not be the one who gave him the power which he misused?

It follows that so much of the order of the court as directed a judgment for the defendant must be reversed, and the case remanded for a new trial.

Reversed.